UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CENTURY SURETY COMPANY, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-08-1901 |
| | § | |
| DEWEY BELLOWS OPERATING COMPANY, LTD, | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM OPINION & ORDER**

Pending before the court is plaintiff Century Surety Company's motion for summary judgment. Dkt. 22. Upon consideration of the motion, the response, the reply, the summary judgment record, and the applicable law, the motion is GRANTED. Further, because the court finds that no duty to defend or indemnify exists, the court ORDERS that defendant Dewey Bellows Operating Company, Ltd.'s counterclaim be DISMISSED with prejudice. Dkt. 14.

**BACKGROUND**

**The Underlying Suit**

Defendant Dewey operated a two-acre surface facility pursuant to an oil and gas lease between Dewey and persons Dewey initially believed to be the owners of the surface estate. Dewey also entered into a Salt Water Disposal Agreement with the purported owners. As part of that agreement and under a permit issued by the Texas Railroad Commission, Dewey operated a salt-water injection well on the leased two-acre facility. During the time period from 2007 to 2008, Dewey allegedly negligently, recklessly, or intentionally discharged a significant amount of "salt water, oil, and other substances from [its] commercial salt water disposal operation and oil and gas operations onto and under" the real property. Dkt. 21, Ex. A ¶ 2.07. Dewey pinpoints the time of

one such discharge as occurring on or about January 28, 2008 and further explains that production salt water leaked from a break in a flow line located on a part of the property not included in the two-acre facility. Dkt. 14 ¶ 16. Dewey further claims that it sent a letter to Century on January 31, 2008 reporting the leak. *Id*. ¶ 17.

The ownership of the property came into dispute. And, in July of 2007, the San Antonio Court of Appeals affirmed the district court's finding that the plaintiffs in the suit underlying the instant declaratory judgment action—not the parties to the contract with Dewey—were the owners of the real property in question. *See Rodriguez v. Garza*, No. 04-06-00139-CV, 2007 WL 2116411 (Tex.App.–San Antonio 2007, no pet.). Shortly thereafter, the actual owners filed the Underlying Suit in Starr County against Dewey alleging that Dewey or persons acting for Dewey had (1) entered the property and conducted operations there without permission and, (2) paid royalties on minerals produced from the property to persons other than the rightful owners, (3) operated a salt water disposal facility in a manner that caused damage to the surface and subsurface of the leased two-acre facility, and (4) operated a salt water disposal facility and other production-related activities in a manner that caused damage to the surface and subsurface of the property outside the leased two-acre facility. *See* Dkt. 1, Ex. C.

**The Policies**

Century issued three substantially identical Commercial General Liability Policies to Dewey that combined to cover the period from January 19, 2005 through January 19, 2008 ("the Policy").[1] Dkt. 21, Exs. D-1, D-2, D-3. The Policy provided three types of coverage: (1) Coverage A for bodily injury and property damage liability, (2) Coverage B for personal and advertising injury liability, and

---

[1] For ease of reference, the court will refer to the policies in the singular and cite to the policy covering the period from January 19, 2007 to January 19, 2008 attached as Exhibit D-1 to Century's motion. Dkt. 21, Ex. D-1.

(3) Coverage C for medical payments. Additionally, the Policy contained a pollution exclusion, and an exception for short term pollution events.

**The Declaratory Judgment Action**

On March 17, 2008, Century filed this suit seeking a declaratory judgment that it owes no duty to defend or indemnify Dewey in the Underlying Suit. Dewey answered and counterclaimed, seeking a declaration that Century owes it these duties. Century now moves the court for summary judgment on its claims.

## ANALYSIS

**I. Summary Judgment**

A timely motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008). Upon a defendant's motion for summary judgment, the plaintiff "must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." FED. R. CIV. P. 56(e). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required. *Id.*

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting FED. R. CIV. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of*

*Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Amer. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

## II. Contract Interpretation

"Texas courts interpret insurance policies according to the rules of contract construction." *de Laurentis v. U.S. Auto. Ass'n*, 162 S.W.3d 714, 721 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). The primary objective of the court is to ascertain the parties' intent, as expressed in the written instrument. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). "[T]he parties' intent is governed by what they said, not by what they *intended* to say but did not." *Nautilus Ins. Co. v. Country Oaks Apartments, Ltd.*, — F.3d —, 2009 WL 1067587, at *2 (5th Cir. Apr. 22, 2009) (quoting *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006)) (internal quotation omitted).

"If the insurance policy is worded so that it can be given a definite meaning or certain legal meaning, then the policy is not ambiguous. If the policy is not ambiguous, then the court construes the policy as a matter of law." *Brown & Brown of Tex., Inc. v. Omni Metals, Inc.*, — S.W.3d —, 2008 WL 746522, at *4 (Tex. App.—Houston [1st Dist.] Mar. 20, 2008, no pet. h.) (citing *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)) (internal citation omitted). An ambiguity exists where a policy is susceptible to more than one meaning. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Courts interpreting contractual provisions give terms their plain, ordinary, and generally accepted meanings, unless otherwise defined by the parties. "'Both the insured and the insurer are likely to take conflicting views of coverage, but neither conflicting expectations nor disputation is sufficient to *create* an ambiguity.'" *Nat'l Union Fire Ins. Co. of*

*Pittsburgh, PA v. U.S. Liquids, Inc.*, 271 F. Supp. 2d 926, 932 (S.D. Tex. 2003) (quoting *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994)). "[I]f, and only if, the court finds an ambiguity in the contract provisions, particularly in exclusionary clauses, the court should construe the policy strictly against the insurer." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 271 F. Supp. 2d at 932; *see also Waffle House, Inc. v. Travelers Indem. Co. of Ill.*, 114 S.W.3d 601, 607 (Tex. App.—Ft. Worth 2003, pet. denied) (cautioning that exclusionary provisions "must be clearly expressed and must not be ambiguously worded"). And, "if the insured's construction of an exclusionary provision is reasonable, it must be adopted, even if the insurer's construction is more reasonable." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 271 F. Supp. 2d at 931.

Two distinct duties are at issue in the motion for summary judgment pending before the court: the duty to defend and the duty to indemnify. The duty to defend determination centers on whether the factual allegations in the petition support a covered claim; whereas, the duty to indemnify is established based on the facts proven in the Underlying Suit. *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 310 (Tex. 2006). Therefore, the duty to defend is broader; thus an insurer may have a duty to defend, yet no duty to indemnify. *Solvent Underwriters Subscribing to Energy Ins. Intern., Inc. v. Furmanite Am., Inc.*, — S.W.3d —, 2009 WL 280500, at * 4 (Tex. App.—Houston [14th Dist.] Feb. 5, 2009, no pet. h.).

**III. Application**

The court finds that based on the summary judgment record before it, Century owes no duty to defend and therefore no duty to indemnify Dewey under the Policy.

    **A.**     **Duty to Defend**

"Under the eight-corners rule, the duty to defend is determined by the claims alleged in the petition and the coverage provided in the policy." *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins.*

6

*Co.*, 279 S.W.3d 650, 654 (Tex. 2009).  "Resort to evidence outside the four corners of these two documents is generally prohibited." *Nautilus Ins. Co.*, 2009 WL 1067587, at *2.  "However, when the petition does not contain sufficient facts to enable the court to determine if coverage exists, it is proper to look to extrinsic evidence in order to adequately address the issue." *W. Heritage Ins. Co. v. River Entm't*, 998 F.2d 311, 313 (5th Cir. 1993) (citing *State Farm Fire & Cas. Co. v. Wade*, 827 S.W.2d 448, 452-53 (Tex.Civ.App.–Corpus Christi 1992, writ denied). "The duty to defend does not depend upon the truth or falsity of the allegations: 'A plaintiff's factual allegations that potentially support a covered claim is all that is needed to invoke the insurer's duty to defend . . . .'" *Nautilus Ins. Co.*, 2009 WL 1067587, at *2 (quoting *GuideOne Elite Ins. Co.*, 197 S.W.3d at 307).

When the petition does not present facts within the scope of the policy's coverage, the insurer is not legally obligated to defend a suit on behalf of the insured.  *Pine Oak Builders, Inc.*, 279 S.W.3d at 654.  But, if the facts in the pleadings give rise to *any* claim covered under the policy, then the insurer has a duty to defend the insured with respect to all of the claims.  *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 201 (Tex. 2004).  Although the allegations in the petition are interpreted liberally and in favor of the insured, the court must not "read facts into the pleadings," "look outside the pleadings," or "imagine factual scenarios which might trigger coverage."  *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 142 (Tex. 1997).  The court's inquiry must turn on the facts alleged and the origin of damages, rather than the legal theories asserted.  *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 271 F. Supp. 2d at 931; *see also Am. Auto, Inc. v. Mayfield*, 287 F. Supp. 2d 661, 664 (N.D. Tex. 2003).  Nonetheless, "all doubts regarding the duty to defend [are resolved] in favor of the duty." *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002).

But, "when the plaintiff's petition makes allegations which, if proved, would place the plaintiff's claim within an exclusion from coverage, there is no duty to defend." *Gulf States Ins. Co. v. Alamo Carriage Serv.*, 22 F.3d 88, 90 (5th Cir. 1994); *see also Chapman v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 171 S.W.3d 222, 228 (Tex. App.—Houston [1st Dist.] 2005, no pet.) ("An insurer has no duty to defend if a petition against an insured alleges facts excluded by the policy."). When the insurer argues that the policy exclusion excepts coverage, the insurer bears the burden of demonstrating that the exclusion applies. *Utica Nat. Ins. Co. of Tex.*, 141 S.W.3d at 203. The Fifth Circuit has explained the burden shifting framework as follows:

> The insured bears the initial burden of showing that the claim . . . is potentially within the insurance policy's scope of coverage. If the insurer relies on the policy's exclusions to deny coverage, the burden shifts to the insurer to prove the exclusion applies. If the insurer is successful, the burden shifts back to the insured to show that an exception to the exclusion brings the claim . . . potentially within the scope of coverage under the insurance policy.

*Am. Auto. Inc.*, 287 F. Supp. 2d at 664–65 (quoting *Harken Exploration Co. v. Sphere Drake Ins. P.L.C.*, 261 F.3d 466, 471 (5th Cir. 2001)).

### 1. Coverages B and C

As a threshold matter, the parties do not argue that Coverage C applies to any of the underlying plaintiffs' claims. And, a review of Coverage B reveals that it also does not cover the damages alleged in the underlying petition. Coverage B states that it "will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." *See* Dkt. 21, Ex D-1 at 15. The Policy has an oil and gas amendatory endorsement which defines personal and advertising injury as follows:

> "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of on or more of the following offenses:
>     a.    False arrest, detention or imprisonment;
>     b.    Malicious prosecution;

8

    c.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor; or

    d.  Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.

*Id.* at 39. The only injury alleged in the underlying complaint that could theoretically fall into one of those categories is Dewey's alleged entry without permission onto the property. However, Texas law construes the wrongful entry injury covered by personal and advertising policies like the one above as applicable only to landlord tenant situations, not oil and gas leases. *Decorative Center v. Employers Cas. Co.*, 833 S.W. 2d 257, 260–61 (Tex. App.–Corpus Christi 1992, writ denied); *accord Mid-Continent Cas. Co. v. Camaley Energy Co.*, 364 F. Supp. 2d 600, 608 (N.D. Tex. 2005). And, the plain language of the definition clearly intends that the space wrongly entered be "a room, dwelling or premises that a person occupies." not non-residential property. Therefore, the court finds that Coverage B does not cover the injuries alleged in the Underlying Suit. Accordingly, Coverages B and C trigger no duty to defend.

  **2.**  **Coverage A**

 Coverage A applies to bodily injury and property damage liability. Under the burden shifting inquiry applied by Texas courts, the insured must first demonstrate that the injuries are potentially covered by the policy. *See Harken*, 261 F.3d at 471. For the purpose of this inquiry, the injuries alleged by the underlying plaintiffs fall into one of three groups. Group 1 consists of all of those injuries arising from the fact that Dewey leased the land and contracted for the salt water disposal facility with someone other than the property owner. Group 2 consists of injuries to the surface and subsurface of the two-acre salt water disposal facility. And, Group 3 contains those injuries to the surface and subsurface of the property outside the two-acre facility.

The Policy does not cover the Group 1 injuries, because as a matter of law, they are not "occurrences." Under the Policy, the damage must be "caused by an 'occurrence.'" Dkt. 21, Ex. D-1 at 11. The oil and gas amendatory endorsement defines occurrence as follows:

> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All "bodily injury" or "property damage" arising out of an "occurrence" or series of related "occurrences" is deemed to take place at the time of the first such damage or injury even though the nature and extent of such damage or injury may change; and even though the damage may be continuous, progressive, cumulative, changing or evolving; and even though the "occurrence" causing "bodily injury" or "property damage" may be continuous or repeated exposure to substantially the same general harmful conditions.

*Id.* at 39. In *Argonaut Southwest Insurance Company v. Maupin*, the Texas Supreme Court held, based on similar facts, that the insured was not covered under a policy because there was no occurrence. 500 S.W.2d 633 (Tex. 1973). There the insured had entered into a contract with a purported property owner to remove soil from real property. *Id.* at 633–34. After removing the soil, the actual owners of the property sued the insured for trespass. *Id.* at 634. The insurance company denied coverage saying that no accident had occurred, and the Texas Supreme Court agreed. *Id.* at 635.

> Damage complained of here was the removal of the large amount of material from the property. [Insureds] did exactly what they intended to do. The fact that they did not deal originally with the owners of the property was the mistake or error. There was no insurance against liability for damages caused by mistake or error. The plaintiff's act in trespassing upon the [actual owners'] property did not constitute an accident.

*Id.* Here, the Group 1 injuries arise from activities Dewey intended. Dewey entered into a lease to perform oil and gas production activities on real property. It performed those activities, including paying royalties to the persons it thought were the owners of the real property. None of these activities was an accident. *See also Harkin*, 261 F.3d at 473 (finding that the operation of oil facilities did not constitute an accident, but the spills resulting from the negligent operation did).

Therefore, the group 1 injuries are not occurrences under the Policy and are not covered by Coverage A.

The court turns next to those injuries alleged in Groups 2 and 3. Assuming *arguendo* that the injuries falling into Groups 2 and 3 are occurrences and are covered, the court finds that they fall into exclusions under the Policy. Group 2 falls into an exclusion for "property damage" to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." Dkt. 21, Ex. D-1 at 15 (exclusion j(5)). Under the Policy, "property damage" means "[p]hysical injury to tangible property, including all resulting loss of use of that property." *Id.* Those allegations in the Underlying Suit in Group 2 all include property damage, as defined above, to the two-acre area on which Dewey operated the salt-water disposal facility as a result of the operations of that facility. The underlying plaintiffs allege that Dewey failed to comply with the standards of care for operating a salt-water disposal facility, and as a result disposed of salt-water in other wells and onto the surface itself. *Id.*, Ex. A ¶ 2.08. These injuries fall squarely into this exclusion and are, therefore, not covered.

However, even if those injuries alleged in Group 2 did not fall into the above exclusion, both Groups 2 and 3 fall into the Policy's pollution exclusion. That exclusion reads in relevant parts

> "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":
> (a)     At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.
>            •      •      •
> (e)     At or from any premises, site or location on which any insured or contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought onto the premises, site or location in connection with such operations by insured, contractor or subcontractor.

11

Dkt. 21, Ex. D-1 at 13 (exclusion f(1)(a), (d)).  The Policies define "pollutant" as

> [A]ny solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

*Id.* at 24.

In the Underlying Suit, the plaintiffs allege that (1) the insured stored salt water in geological formations damaging the subsurface, (2) in 2007 and 2008, the insured discharged salt water, oil and other substances onto and under the property, destroying approximately 5 acres and harming groundwater, (3) in the second half of 2007, due to a break in a flow line, all of the salt water was directly discharged onto the surface and later flushed by rain into other subsurface formations, and (4) in December 2008, insured discharged onto the property salt water, oil, and other substances from an oil and gas operation at a tank battery and revealed previously unreported discharges due to erosion at the site.  Dkt. 21, Ex. A.

The allegations all concern property damage as defined in the Policy.  However, each allegation involves a pollutant.  The oil and other substances from the commercial salt water disposal operations, and oil and gas operations are undoubtedly irritants based on the property damage they are alleged to have caused to the property.  *United Nat'l Ins. Co. v. Hydro Tank, Inc.*, 525 F.3d 400, 401–02 (5th Cir. 2008).  And, courts have consistently held that salt water is a pollutant in the context of similar, if not identical, policy language and facts.  *See Am. Family Equity Ins. Co. v. Castlemane Farms, Inc.*, 220 F. Supp. 2d 809, 814 (S.D. Tex. 2002) ("There can be no dispute that the contents of a 'salt-water disposal pipeline' is within the category of 'liquid waste.'"); *Investors Ins. Co. of Am. v. Breck Operating Corp.*, No. Civ. A. 1:02-122-C, 2003 WL 2156849 at *9 (N.D. Tex. May 8, 2003) (collecting cases); *see also Harken*, 261 F.3d at 475 (including salt water as a pollutant).  *Accord Nautilus Ins. Co. v. Country Oaks Apartments Ltd.*, 566 F.3d 452, 456 (5th Cir.

12

2009) (using salt water as one example of a substance that need not "generally or usually act as an irritant or contaminant to constitute a 'pollutant' under the pollution exclusion"); *Mesa Operating Co. v. Cal. Union Ins. Co.*, 986 S.W.2d 749, 757 (Tex.App.–Dallas 1999, pet. denied) (discussing salt water contamination when discussing the temporal aspect of an "occurrence"). Therefore, the injuries alleged in Groups 2 and 3 clearly fall within the Policy's pollution exclusion.

Under Texas law, the burden now shifts to the insured to show any exceptions to the exclusion(s). Dewey argues that under the facts in this case the Policy's short-term pollution event endorsement provides an exception to the pollution exclusion. The endorsement provides that the pollution exclusion will not apply if the insured establishes all of the following:

1. The "occurrence" was accidental and was neither expected nor intended by [Dewey];

2. The "occurrence" was caused by an intervening event that was itself neither expected nor intended by [Dewey];

3. The "occurrence" did not result from [Dewey's] intentional or willful violation, or [Dewey's] failure to act or comply with any applicable directive, order, statute, rule or regulation;

4. The "occurrence" can be identified as commencing at a specific date and time during the period of the policy, and not as contribution in any way to injury or damage caused by "pollutants" prior to the date of this policy; and

5. The "occurrence" became known to [Dewey] within 48 hours after its commencement, and you reported that "occurrence" to [Century] no later than 14 days thereafter.

Dkt. 21, Ex. D-1 at 51. Since the prerequisites are conjunctive, the exception will not apply if Dewey fails to meet any of these five conditions. Because the court finds that Dewey has not met its burden on the fourth and fifth conditions, the exception does not provide coverage.

13

As a threshold matter, the court notes that the exception measures the times within which Dewey must have discovered the "occurrence" and notified Century of the "occurrence" from the time of the *commencement* of the "occurrence." This emphasis on the commencement of the "occurrence" appears again in the definition of "occurrence." The oil and gas amendatory endorsement to the Policy defines "occurrence" as

> [A]n accident, including continuous or repeated exposure to substantially the same general harmful conditions. All "bodily injury" or "property damage" arising out of an "occurrence" or series of related "occurrences" **is deemed to take place at the time of the first such damage or injury** even though the nature and extent of the damage or injury may change; and even though the damage may be continuous or repeated exposure to substantially the same general harmful conditions.

*Id.* at 39 (emphasis added). Because the underlying petition does not contain facts that allow the court to determine when Dewey knew of an "occurrence" and when it reported that "occurrence," the court looks to extrinsic evidence to determine these dates. *Western Heritage Ins.*, 998 F.2d at 313. The *only* set of dates that Dewey gives regarding its knowledge of a specific "occurrence" and its report of that "occurrence" to Century is found in Dewey's counterclaim. Dkt. 14 at 3. There Dewey alleges that a leak in a flow line occurred on or about January 28, 2008. *Id.* Dewey claims that it reported the discharge to Century in a letter dated January 31, 2008. *Id.* However, the policy expired on January 19, 2008—before the commencement of the "occurrence." The fourth condition requires that the "'occurrence' can be identified as commencing at a specific date and time during the policy." Dkt. 21 at 51. Even if the court were to find—which it does not—that the "occurrence" commenced on January 17, 2009, 14 days before Dewey's notification letter to Century, Dewey would still have failed the fifth condition. The fifth condition requires that Dewey know about the "occurrence" within 48 hours of its commencement. And, the facts alleged by Dewey in the counterclaim simply do not support that contention. Therefore, absent any set of facts that would

14

place the injuries in the Underlying Suit within the short-term pollution event endorsement, the pollution exclusion acts as a bar to Dewey's claims. Accordingly, Dewey's claims are not covered by the Policy, and Century has no duty to defend Dewey in the Underlying Suit.

### B. Duty to Indemnify

In its motion for summary judgment, Century seeks a declaration from the court that, in addition to declaring that Century has no duty to defend Dewey, Century also has no duty to indemnify Dewey for any judgment rendered in the Underlying Suit. Dewey did not respond to Century's arguments regarding the duty to indemnify.

"Unlike the duty to defend, which arises when a petition seeking damages alleges facts that potentially support claims covered by a liability policy, the duty to indemnify arises from proven, adjudicated facts." *Classic Performance Cars, Inc. v. Acceptance Indem. Ins. Co.*, 464 F. Supp. 2d 652, 663–64 (S.D. Tex. 2006) (citing *Hartrick v. Great Am. Lloyds Ins. Co.,* 62 S.W.3d 270, 275 (Tex. App.—Houston [1st Dist.] 2001, no pet.) and *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821 (Tex.1997)). Thus, the Texas Supreme Court has recognized that it may be necessary to defer resolution of the question of coverage, and thus the duty to indemnify, until factual questions have been resolved at trial. *Utica Nat'l Ins. Co.*, 141 S.W.3d at 201 (citing *Farmers Tex. County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997)). However, when "the insurer has no duty to defend, 'the duty to indemnify is justiciable . . . [if] the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify.'" *Id.* at 664 (quoting *Farmers Tex. County Mut. Ins. Co.,* 955 S.W.2d at 84). The analog of this argument, which has been recognized by other courts, therefore, is that an insurer with no duty to defend invariably owes no duty to indemnify. *See Am. Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 324 (5th Cir. 2001). Since a verdict in the Underlying Suit favoring the Underlying Plaintiffs would either (1) not fall

15

under the Polices' coverage because there would not be an "occurrence;" or (2) fall under the pollution exclusion, coverage is precluded by the express and unambiguous terms of the Policy. Therefore, the court finds that Century has no duty to indemnify Dewey in the Underlying Suit.

### C. Dewey's Counterclaims

Dewey has asserted a counterclaim seeking a declaration that Century owes a duty to defend and indemnify Dewey in the Underlying Suit. Dkt. 14. Because the court finds that no duty to defend or indemnify exists, the court dismisses Dewey's counterclaim.

### CONCLUSION

Pending before the court is plaintiff Century Surety Company's motion for summary judgment. Dkt. 22. Upon consideration of the motion, the response, the reply, the summary judgment record, and the applicable law, the motion is GRANTED. Further, because the court finds that no duty to defend or indemnify exists, the court ORDERS that defendant Dewey Bellows Operating Company Ltd.'s counterclaim be DISMISSED with prejudice. Dkt. 14.

It is so ORDERED.

Signed at Houston, Texas on September 2, 2009.

_____
Gray H. Miller
United States District Judge

TO ENSURE PROPER NOTICE, EACH PARTY RECEIVING THIS ORDER SHALL
FORWARD IT TO EVERY OTHER PARTY AND AFFECTED NONPARTY